SMITH, Chief Judge.
The Department of Revenue (DOR) appeals a final judgment granting declaratory and injunctive relief to Anheuser-Busch, Inc. (ABI) and its subsidiaries, and Anheu-ser-Busch Co. (ABC) and its subsidiaries regarding a proposed corporate income tax *878 assessment for the tax years 1977-1981. We reverse.
The dispute in this case is whether inter-company transactions between MCC and Anheuser-Busch constitute “sales” so as to be included in the apportionment formula[1] for purposes of Florida’s corporate income tax[2] for the years 1977 through 1981, and for purposes of the emergency excise tax[3] for the year 1981.[4]
The facts, briefly, are that Metal Container Corporation (MCC), which manufactures beer cans, was a wholly-owned subsidiary of ABI for the tax years 1977-79. In 1979, a new parent holding company, ABC, was created, and ABI and MCC became brother-sister companies and wholly-owned subsidiaries of ABC for the tax years 1980-81. (Hereinafter for ease in reading this opinion only, ABI and ABC will be referred to collectively as Anheu-ser-Busch.) MCC has three plants, one of which is located in Jacksonville, Florida. MCC delivers the beer cans produced there exclusively to Anheuser-Busch’s brewery in Jacksonville. Similarly, the beer cans produced at the other two out-of-state plants are delivered exclusively to nearby Anheuser-Busch breweries. After Anheu-ser-Busch puts beer in the cans, the finished product is sold to third parties.
On these facts (among others which will be discussed), the trial court, relying on this court’s decision in Coulter Electronics, Inc. v. Department of Revenue, 365 So.2d 806 (Fla. 1st DCA 1978), and Tropicana Products, Inc. v. Department of Revenue, Case No. CA-74-1799, 12th Judicial Circuit in and for Manatee County, Florida, affd per curiam by the Second District Court of Appeal, 353 So.2d 686 (Fla. 2d DCA 1977), ruled that these transactions did not constitute sales for apportionment purposes.
We find significant differences between the controlling facts in this case and those in Coulter and Tropicana. In Coulter, Coulter and two of its subsidiaries, Diagnostics and Blood Services, filed consolidated Florida income tax returns. Coulter was engaged in the manufacturer and sale of medical instruments and equipment. Diagnostics produced chemical agents that were used by customers in connection with that medical equipment. Blood Services produced materials that were used and consumed by Diagnostics in manufacturing those chemical agents. Coulter made all the sales to ultimate customers of products manufactured by Diagnostics, and Diagnostics did not make any sales to unrelated third parties. While all products manufactured by Diagnostics were delivered to the customer by Diagnostics, the invoice was rendered by Coulter and payment was made by the ultimate customer to Coulter. Blood Services sold most of its product to Diagnostics and the materials produced by Blood Services were used and consumed by Diagnostics in manufacturing its products. Because Coulter, rather than Diagnostics, rendered the invoices to customers for products manufactured and delivered by Diagnostics to outside customers, Coulter treated Diagnostics as having sold the product to Coulter for internal accounting purposes. Similarly, it treated Blood Services as having sold its product to Diagnostics for internal accounting purposes. Invoices were not prepared on a sale-by-sale basis, but instead there was a monthly recapitulation prepared for all the sales. No payments were ever made by Coulter to Diagnostics, or by Diagnostics to Blood Services.
*879 Finally, as this court stated in its Coulter opinion, there was no delivery of any product from Diagnostics to Coulter, since the products in question were delivered by Diagnostics to the ultimate customer. Although they were called “sales” on their books, this court found that these transactions did not have the indicia of sale: transfer of title, delivery, and payment. More importantly, for purposes of comparison with the can transactions in this case, the intercompany sales in Coulter were “disregarded for the purpose of federal income tax.” 365 So.2d at 808. Accordingly, the court held that these transactions did not constitute sales within the meaning of sections 214.71(3) and 220.15(1), and thus were not required to be included in Coulter’s sales factor for purposes of the corporate income tax apportionment formula.
In Tropicana,[5] Industrial Glass was a wholly-owned subsidiary of Tropicana and was engaged in the manufacture and sale of the glass containers for Tropicana’s citrus juices and related products. Industrial’s manufacturing plant was located in Bradenton, on property owned by Tropicana, and substantially all of Industrial’s production was supplied to Tropicana. Industrial’s only bank account was a payroll account in which deposits were made by Tropicana. A worksheet was prepared monthly showing the quantity and prices of glass containers supplied to Tropicana. Tropicana paid all of the bills of Industrial, and the amount of such payment was credited against the amount shown on the worksheet. A nearly identical arrangement existed between Tropicana and another subsidiary, National Packaging, which engaged in the manufacture of corrugated boxes.
On these facts, the circuit court in Tropicana found that the transactions therein did not reflect business activity of the type contemplated by the apportionment statute and thus the inclusion of such sales would not be within the intent of Florida’s apportionment statute. Again, for purposes of comparing Tropicana with the facts in this case, it is noteworthy that in Tropicana, the intercompany liability there had no independent significance for financial reporting or for federal income tax purposes, because Tropicana prepared consolidated financial statements, consolidated federal tax returns, and consolidated Florida tax returns, and the intercompany accounts were eliminated on all such statements and the effect of the intercompany transactions was eliminated in the returns.
In contrast to the facts in Coulter and Tropicana, the facts in this case reveal the following: when MCC transferred the empty beer cans to Anheuser-Busch, these transactions were called “sales” on its books. The aggregate “total amount invoiced” shown as “sold to” Anheuser-Busch on such invoices was recorded on MCC’s books as accounts receivable. In turn, Anheuser-Busch entered the “total amounts invoiced” in respect to these deliveries of metal cans to it upon its records as inventory and created accounts payable due MCC in counterpart amounts. The payments made by Anheuser-Busch to MCC were made indirectly, by journal entry, rather than by direct cash payments. An-heuser-Busch advanced cash (as needed) to MCC and paid certain of MCC’s obligations directly to third parties. Periodically, An-heuser-Busch aggregated such advances and its payments of MCC’s obligations and by journal entry, debited (offset) the accounts payable balances due MCC reflected upon Anheuser-Busch’s books. In turn, MCC, by periodic journal entry, aggregated such cash advances and payments made on its behalf by Anheuser-Busch and credited (offset) them against the accounts receivable from Anheuser-Busch recorded on MCC’s books.
Without unduly belaboring the point, we find that unlike the situation in Coulter, the indicia of a sale are present in this case. The cans were “invoiced” as “sold to” An-heuser-Busch. Delivery of the cans to An- *880 heuser-Busch by MCC is uncontroverted. Finally, we find that Anheuser-Busch’s cash advances to MCC and payment of MCC’s third party obligations constitute sufficient evidence of payment. We note, significantly, that the transactions involved meet the sales destination test set forth in section 214.71(3)(a)l. Compare Department of Revenue v. Parker Banana Co., 391 So.2d 762 (Fla. 2d DCA 1980). See also the discussion in J.R. Hellerstein, State Taxation: Corporate Income and Franchise Taxes, paragraph 9.17[l][a] (1983).
The real issue in this case is Anheuser-Busch’s contention that it should be entitled to eliminate the effect of its intercom-pany transactions in the apportionment formula because it has filed a consolidated return in which intercompany transactions are eliminated in the computation of taxable income. However, to accept Anheu-ser-Busch’s argument would confuse apportionment with taxability.
In his law review article on the then new Florida corporate income tax, former Florida Supreme Court Justice Arthur England explained the highly technical concept of consolidated reporting thusly:
For federal income tax purposes, taxpayers related through stock ownership of at least eighty percent of the voting power of all classes of stock and at least the same percentage of nonvoting shares may file a consolidated return rather than several separate returns. The principle advantage of such filing to a group of eligible corporations is the elimination of tax on transactions between the members of the affiliated group. In theory, the consolidated return provides a basis for taxing the net income earned by members of the group only from sources outside the related group so that no tax is paid on the several levels of net income generated by transactions among the affiliates.
The manner of allowing Florida consolidation changed a number of times in the development of the Florida Code, but in each phase it was recognized that Florida’s tax law could not fairly mirror the federal treatment of affiliated groups. The interstate and multijurisdictional problems of state taxation seemed to require the creation of a Florida “affiliated group” which would differ from the federal group. As finally adopted, the Florida Code allows any Florida parent of an affiliated group of corporations to file a consolidated Florida return with its instate affiliates. As a means of accommodating taxpayers desiring to file in Florida on the same basis as they file for federal purposes, the statute also allows a Florida parent and all of its federal corporate affiliates to elect to file their federal consolidated return in Florida, even though some members of the group would not otherwise be subject to tax in Florida.
A. England, Income Taxation in Florida: Background, Scope, and Analysis, F.S.U. Law Review 1972, pp. 12-13.
In this case, Anheuser-Busch and its affiliates, including MCC, elected to file consolidated returns for both federal and Florida purposes. As stated earlier, the amount of federal taxable income, which is computed in the consolidated federal return, and which constitutes the base of the Florida corporate income tax, is not in dispute by the parties. Neither party disputes that intercompany transactions may be eliminated in the computation of the tax base which, after certain computations provided for in the statutes, constitutes the income subject to apportionment.
The concept of apportionment is distinguishable from taxability. The purpose of Florida’s apportionment statute is to apportion a part of the multi-state taxpayer’s total income from all sources to the State of Florida based on the taxpayer’s Florida business activities. A. England, Income Taxation in Florida: Background, Scope, and Analysis, F.S.U. Law Review 1972.
Nevertheless, utilizing consolidated return principles, Anheuser-Busch contends that MCC and it constitute one taxpayer for purposes of apportionment, and thus intercompany transactions between them should be eliminated from the sales factor of the apportionment formula. This overlooks the well-established law that *881 each of the two or more corporations joining in a consolidated return is none the less a taxpayer. Woolford Realty Co. v. Rose, 286 U.S. 319, 328, 52 S.Ct. 568, 570, 76 L.Ed. 1128, 1133 (1932). See also § 220.131, Fla.Stat. The election to file a consolidated return does not destroy the existence of separate corporate entities existing within the group. Cohen, Broadbent, Wagman and Kronovet, Consolidated Returns, Computation of Separate Taxable Income, Tax Management Portfolio No. 200 (Dec. 9, 1974). Thus, Anheuser-Busch and MCC constitute two taxpayers for apportionment purposes.
Section 220.15(1), Florida Statutes, provides that for the purposes of applying the apportionment formula, the term “sales” in section 214.71(3)(a) shall mean all gross receipts of the taxpayer except interest, dividends, rents, royalties, and gross receipts from the sale, exchange, maturing, redemption or other disposition of securities. In that respect, we note that rule 12C-1.15(4)(d), Florida Administrative Code, states that for the purposes of the sales factor of the apportionment formula, the term “sales” means all gross receipts received by the taxpayer from transactions and activities in the regular course of its trade or business.
In determining the best evidence of the gross receipts of these two taxpayers, An-heuser-Busch’s treatment of the sale of these beer cans in its corporate income tax return (Form 1120) is particularly significant.
In the consolidated federal income tax return filed each year on behalf of Anheu-ser-Busch’s affiliated group, on Form 1120, line 1, captioned “1(a) Gross receipts or sales” the gross receipts of all included corporations were aggregated. In an attached taxpayer schedule, which was required to be filed, entitled “Consolidated Profit and Loss Summary,” the amount of “gross receipts” was reported separately for each included corporation and the sum of the “gross receipts” indicated for each corporation was reconciled to the total amount on line 1(a) of Form 1120. In each year, the amount of “gross receipts” federally reported as being those of MCC represented the annual aggregation of the “total amounts involved” and “sold to” Anheu-ser-Busch. These amounts were reported by Anheuser-Busch in its federal income tax returns for the years in question and were not eliminated in any manner from the consolidated “gross receipts or sales” reflected therein.
However, in Anheuser-Busch’s consolidated Florida corporate tax returns for each of these tax years, in the computation of the Florida sales factor used for the Florida apportionment purposes, these gross receipts attributable to MCC in the federal income tax returns were omitted from the sales factor. In computing its proposed assessments, DOR restored these gross receipts to the sales factor denominator as representing gross receipts from all sales of beer cans by MCC to Anheuser-Busch.
From information supplied by Anheuser-Busch, DOR computed the gross receipts representing Florida sales of beer cans to Anheuser-Busch’s Jacksonville brewery from MCC’s nearby Jacksonville facility. In computing the proposed deficiency for the taxable years in question, DOR restored these figures to the numerator of the sales factor used for each respective tax year.
DOR’s action is entirely consistent with Florida’s corporate income tax statutes. Section 220.43(1), Florida Statutes, requires each taxpayer making a Florida return to take into account items of income, deduction, and exclusion in the same manner and amounts as reflected in the taxpayer’s federal income tax return for the same taxable year. In this case, in each of the consolidated profit and loss summaries attached to Anheuser-Busch’s federal returns, separate columns delineated MCC’s contributions to the various consolidated totals. Notably, significant separate amounts were reported as “gross profits,” and “taxable income,” which amounts were the result of deducting from MCC’s reported “gross receipts or sales” amounts of MCC’s separate expenses.
*882 This is in keeping with the separate accounting method required in the federal return. Where there are parent-subsidiary corporations, each corporation’s income as reflected on its books represents a separate accounting for its particular area of operation. See generally, Weissman, A Primer on Florida’s Unitary Method of Corporate Taxation in Capitalizing on Its Idio-syncracies, 58 Fla.BarJ. 38, January 1984.
At this juncture, it is important to point out that this case does not involve the unitary method of accounting which does provide for the elimination of intercompany sales in the computation of the sales factor. The 1983 Legislature mandated the unitary reporting method for all members of the unitary business group in section 220.135, Florida Statutes (1983). However, this was made applicable only to taxable years beginning on or after September 1, 1982, periods postdating the taxable years herein.[6] Unitary business groups are subject to special rules in regard to apportionment which have not been invoked in this case either by the taxpayer or DOR. See generally, 54 Fla.Jur.2d, Taxation, § 41:107.
In conclusion, we find that DOR did not err in accepting the gross receipts figures for MCC in the federal returns for each year as the best evidence of the economic effect of MCC’s corporate activities in Florida and elsewhere.
REVERSED and REMANDED for proceedings consistent with this opinion.
WENTWORTH, J., concurs.
BOOTH, J., dissents with written opinion.

. See § 220.15 and 214.71(3), Fla.Stat.

. See Ch. 220, Fla.Stat.

. The parties stipulated that for the 1981 tax year, the consolidated Florida emergency excise tax return (Chapter 221) pertains to Anheuser-Busch.

. The identical apportionment formula is used for both taxes. Further, the tax base for the computation of these taxes is not at issue. (Because the same apportionment formula is used for both taxes, no further distinction will be made between the taxes for the remainder of the opinion.) Importantly, there is no dispute over the sales by Anheuser-Busch to third parties, all of them being treated as sales for Florida tax apportionment purposes. The dispute pertains only to the can transactions between MCC and Anheuser-Busch.

. We do not normally cite a circuit court opinion which has been per curiam affirmed. However, we cite Tropicana not as precedent, but simply because the trial court's final judgment ís predicated, in part, on the decision and because the facts of the case have been argued and relied upon by the parties.

. § 220.135 was repealed, Ch. 84-549, § 1, Laws of Fla.